Jo-Ann M. BATES

v.

Howard A. BATES.

No. 79–386–Appeal.

Supreme Court of Rhode Island.

Jan. 29, 1982.

Thomas A. Lynch, Providence, for petitioner.

Quinn, Cuzzone, Geremia & Pennacchia, Cameron P. Quinn, Providence, for respondent.

## OPINION

KELLEHER, Justice.

At one time Jo-Ann M. Bates (Jo-Ann) and Howard A. Bates (Howard) were married to each other. Their marital bond was severed on May 14, 1971, by the entry in the Family Court of a final decree of divorce in which Jo-Ann waived alimony and was awarded custody of the couple's two children, aged three and one, and Howard was ordered to pay to Jo-Ann $30 a week for the support of the children. The decree also noted that the couple's marital domicile was

about to be sold and that consequently Jo-Ann had agreed to accept one-half of the net proceeds of the sale in lieu of any claim for alimony.

Later, in February 1976, the couple returned to Family Court where a hearing was held at which Jo-Ann sought to have Howard held in contempt for his failure to satisfy the child-support order. At that time, Howard was in arrears on the payments by $1,680. After a hearing, an order was entered directing Howard to continue to pay the $30 per week support payments and to reduce the arrearage by the payment of an additional $10 per week.

Time marched on, and in February 1979 Jo-Ann and Howard were once again in a litigious situation as Jo-Ann sought an increase in the amount of the basic support order. Two weeks following the conclusion of the hearing on Jo-Ann's motion, the trial justice in a bench decision noted that Howard was still obligated to make a weekly $10 payment on the arrearage and ordered that he pay an additional $10 on the original $30 order. Jo-Ann is now before us on an appeal in which she faults the trial justice for increasing the original support order by "only" $10.

Before looking at the array of income and expense data presented to the trial justice by the litigants, it is appropriate at this point that we remind Jo-Ann, as we have reminded others on countless occasions, of the three principles that govern our review of Family Court disputes in which a parent attempts to increase a child-support order entered as part of a domestic-relations proceeding: (1) the parent, in seeking an increase, has a twofold burden— he or she must prove (a) the children's need for additional support and (b) the other parent's ability to pay more than the amount that was originally fixed in the order presently under review, Hull v. Hull, R.I. 384 A.2d 1065, 1067 (1978); (2) upon proof of both the children's need and the parent's ability to pay, the trial justice must order an increase that represents a reasonable relationship between the children's cur-

rent needs and the parent's present ability to pay, *McCann v. McCann*, R.I. 396 A.2d 942, 944 (1979); and (3) the trial justice's determination of the controversy will not be disturbed upon appeal unless the trial justice in his or her consideration of the factual issues is clearly wrong or has overlooked material evidence or has misconceived the applicable law, *Brown v. Brown*, 114 R.I. 117, 120, 329 A.2d 200, 201–02 (1974).

In his bench decision, the trial justice referred to these pertinent legal principles. At the February 1979 hearing, it was conceded that Howard's average weekly take-home pay for the first nine weeks of 1979 was $235. This figure contrasted with his 1971 take-home pay of $124. However, in cross-examination Howard agreed that his net pay for the year 1978 amounted to $13,408 or an average weekly wage of $257.

Both Jo-Ann and Howard had completed and filed a Family Court printed form that requests the litigants' current incomes, expenses, and other needs. Howard's total weekly expenses and other needs amounted to $220.10. Jo-Ann's form indicated that the children's weekly needs required $219. One of the sons was on a restricted diet that forbade the use of any food containing artificial coloring or flavoring, preservatives, sugar, or corn additives.

When the trial justice analyzed the litigants' respective incomes and expenses, he agreed that the needs of the children had indeed increased but noted as well that Howard's expenses had also grown. The trial justice alluded to the inflationary era in which, he said, "[t]he cost of living has gone up each year since the final decree was entered in this case." After having made these comments, the trial justice launched himself into the mathematical portion of his decision.

He first observed that, based upon Howard's 1979 $235 average weekly take-home pay, Howard's increase in take-home pay since the time of the entry of the 1971 final decree was $91. The trial justice obviously was in error. One needs no calculator to realize that when the 1971 figure of $124 is subtracted from the 1979 figure of $235, the difference is $111, and if $124 is deducted from Howard's admitted 1978 average net weekly pay of $257, the difference is increased to $133. The trial justice did not indicate which of these two income figures he was using in making his calculations.

Howard's counsel argues that this miscalculation is immaterial. What is important, he claims, is the result reached when Howard's weekly expense figure of $220.10 is subtracted from his net weekly income of $257. Once the subtraction is completed, Howard, it is argued, has on hand a paltry $36.90 to satisfy a support order calling for a $40 weekly payment.

Although counsel exhibits skill in subtraction, his analysis, as well as that of the trial justice, of Howard's stated needs leaves something to be desired. A review of Howard's expense sheet indicates that counsel's assessment of Howard's needs is based upon a double-crediting of at least one, and perhaps two, items in the "Loans And Other Obligations" category. In this category Howard lists as an obligation the weekly $40 support payment to Jo-Ann as a result of the final-decree proviso in the 1976 contempt litigation. His attorney, in claiming a weekly $3.10 shortfall after deduction of monthly expenses (based upon a net weekly pay of $257), attempts to go to the well twice when only one dip is in order; Howard has already accounted for this obligation when arriving at his total weekly expense figure of $220.10. To determine Howard's current ability to meet the increased needs of his children, we think a more-appropriate and less-confusing method of calculation would be to list his weekly expenses without including any support obligations that he had been paying as a result of prior litigation. When this obligation is removed from his expense statement, Howard's weekly expenses amount to $180.10. Thus, when one deducts this amount from either the $235 weekly net-pay figure or the $257 weekly net-pay figure, Howard's weekly surplus rises to a level of $54.90 or $76.90, respectively, from which he must pay Jo-Ann the $40 due under the amended order, as well as the $10

arrearage payment. Howard's actual surplus, therefore, remains a mystery. Further, the surplus may be even greater because it was represented to us at oral argument that at this point in time the 1976 arrearage has been paid.

The second possible dip into the well concerns a $30 item that represents a repayment of a loan Howard took in November 1978 when he purchased a brand new 1978 automobile sometime after the 1979 models had been placed on sale. At the hearing, Howard made it clear that the $30 payment is taken out of his weekly pay check. It would appear that since the weekly $30 loan payment is automatically deducted prior to the time Howard receives his pay check, his net-pay figure may already reflect this payment, which he lists as a separate item on his expense sheet, thereby casting a shadow of doubt on the accuracy of his aggregate weekly expense figure of $220.10.

It may be that we are misreading the testimony regarding the status of the car payments, but the tribunal whose decision we are reviewing is called the Family Court. One of the families whose fate is committed to the court's concern consists of two youngsters who at the time of the 1979 hearing were eleven and nine years old. It is our belief that the miscalculations, the doubt about which of Howard's potential net-income figures was employed by the trial justice, and the questionable credits allowed at the 1979 hearing make a meaningful review of the trial justice's award an exercise in futility.

Consequently, Jo-Ann's appeal is sustained, the decree appealed from is vacated, and the case is remanded to the Family Court for a rehearing and a current determination of the litigants' rights and obligations in light of the provisions and criteria set forth in G.L.1956 (1981 Reenactment) § 15–5–16,[1] as amended by P.L.1981, ch. 320, § 1.

---

1. While Jo-Ann's appeal was pending, the General Assembly at its January 1979 session enacted P.L.1979, ch. 279, a portion of which is now known and cited as G.L.1956 (1981 Reenactment) § 15–5–16.2. The enactment clause of the 1979 legislation specifically provided that the act was to be applied to all petitions pending on the date of passage of this act. When viewing similar language in *Zaharakos v. Zaharakos*, 118 R.I. 387, 388–89, 374 A.2d 101, 102 (1977), we ruled that there was no doubt that the Legislature intended the statute to be given retrospective effect, requiring us to adjudicate the case according to the law now existing. Since the record makes this an impossibility, a rehearing is a necessity.